914 A.2d 783

**Robert L. EHRLICH, Jr., et al.**

v.

**Robin D. GROVE.**

**No. 54, Sept. Term, 2006.**

Court of Appeals of Maryland.

Jan. 11, 2007.

Margaret Ann Nolan, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Paul D. Raschke, Asst. Atty. Gen., on brief), for appellants.

Daniel M. Clements (Sarah E. Brannon, Salisbury, Clements, Bekman, Marder & Adkins, L.L.C., Baltimore, on brief), for appellee.

Argued by BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

Opinion by CATHELL, J.

This interlocutory appeal arises from a wrongful termination action brought by Robin Grove, appellee, against Governor Robert L. Ehrlich, Jr., appellant.[1] Since the suit's September 10, 2003, inception,[2] the parties have been mired in a discovery dispute. The subject of this dispute, as it relates to this interlocutory appeal, is whether Grove is to be granted access to information that the Governor claims is protected by executive privilege, attorney-client privilege, and/or the work product doctrine. On appeal we are directly presented with two questions:

"I. Did the Circuit Court abuse its discretion when it ordered expanded *in camera* review[3] of documents protected by attorney-client privilege?

---

**1.** Grove also brought suit against then-Maryland Department of the Environment Acting Secretary Kendl P. Philbrick. We will refer to the defendants collectively as the "Governor."

**2.** On January 15, 2003, Robin Grove's termination was discussed in a Washington Post article, Lori Montgomery, *Ehrlich Reverses Dismissal Letter; Highly Touted Motor Vehicles Administrator Retains Job She Lost Day Before*, Washington Post, January 15, 2003, at B 1, on the gubernatorial transition taking place in Annapolis and the effect it was having on State employees who were replaced by the incoming Ehrlich Administration. Grove was quoted in that article as saying: " 'It's a wonderful part of the democratic process that allows for wholesale change, and I respect that,' " and " 'I just wish they'd given me more than a day and a half [notice].' " Grove filed suit approximately eight months later.

**3.** The concept of *in camera* review is familiar to most in the legal profession, but **expanded** *in camera* review is slightly more obscure. *Black's Law Dictionary* defines *in camera* as: "1. In the judge's private chambers. 2. In the courtroom with all spectators excluded. 3. (Of a judicial action) taken when court is not in session.—Also termed ... *in chambers.*" *Black's Law Dictionary* 775 (8th ed.2004). *In camera* inspection is defined as: "A trial judge's private consideration of evidence." *Id.* Maryland's cases generally use *"in camera* review" and *"in camera* inspection" interchangeably. For simplicity, we will use *"in camera* review" herein.

It seems that the concept of **expanded** *in camera* review made its first appearance in our case law in the criminal case of *Zaal v. State,* 326

Md. 54, 602 A.2d 1247 (1992), where a defendant was attempting to obtain the confidential education records of a child when accused of sexual abuse of that child. *Zaal* was a relatively rare case involving the applicability of a federal statute and State regulations adopted in an attempt to comply with a federal statute: The Family Education Rights and Privacy Act (FERPA), 20 U.S.C.A. §§ 1221 et seq.

It involved a conflict between the privacy provisions of the federal statute and the State regulations with a criminal defendant's right to confront witnesses against him. In the case, the defendant only asserted that access to *some* of the records were necessary for him to effectively cross-examine, i.e., confront, the victim/witness against him. There, in that context, we addressed the issue of whether a defendant charged with child sexual abuse may inspect the school records of the child he has allegedly abused. After concluding that we did not need to make a constitutional determination as to the validity of **expanded** *in camera* review in that particular context, we introduced and explained the operation of the concept of **expanded** *in camera* review albeit in a criminal case:

"When, in striking a balance between a victim's [the position of a victim in a criminal case is sometimes similar to that of a complainant or plaintiff in a civil case] privacy interest and a defendant's right to a fair trial, there is an acceptable alternative *to the defendant's* nonrestricted access to the victim's records, it is not necessary to require the trial court to perform that function which is so foreign to its usual office. An expanded *in camera* proceeding, one in which counsel for the defense and the State participate or permitting the review of the records by counsel in their capacity as officers of the court are acceptable alternatives.

"In such proceedings, counsel for the parties could be given access to the records, in the presence of the trial court, or alone, either as officers of the court, or under a court order prohibiting disclosure to anyone, including the defendant, of anything in the records unless expressly permitted by the court. A well-prepared defense counsel— one who has spoken extensively with his client, developed a strategy for the trial and is familiar, thoroughly, with the State's case—would then be able to bring the advocate's eye to the review of the records, thus, protecting the interest of the defendant in ensuring that relevant, usable exculpatory or impeachment evidence is discovered. On the other hand, both by virtue of the court order restricting dissemination of the information contained in the records and by proceedings to determine admissibility of information defense counsel deems relevant and usable, the victim's right to privacy would be protected. Moreover, by having the benefit of counsel's input on the critical questions of relevance and admissibility, the court is enabled to rule more responsibly. Finally, such proceedings could potentially avoid unintentional, but harmful, disclosures." *Zaal,* 326 Md. at 86–87, 602 A.2d at 1263 (some emphasis added). *Zaal,* thus, primarily concerned issues related to privacy and even then the issue was related to a criminal defendant's right to confront, i.e., effective cross-examination of an alleged victim/complaining witness/ plaintiff.

The parties did not bring to our attention any case which discussed **expanded** *in camera* review in the context of the Governor of Maryland

"II. Did the Circuit Court abuse its discretion when it improperly applied the procedure set forth in *Blades v. Woods*[4] to solicit the consent of third parties to the release of documents it had ruled irrelevant and not reasonably calculated to lead to admissible evidence?"

The Governor also raised executive privilege below and in both of his briefs to this Court discussed issues relating to executive privilege. We answer both specific questions above in the affirmative and additionally hold that an interlocutory appeal is appropriate under the extraordinary circumstance of a discovery order being directed to a Governor of Maryland when the collateral order doctrine's four-part test is met. We also hold that the Circuit Court for Baltimore City abused its discretion when it ordered expanded *in camera* review of documents protected by attorney-client privilege or the work product doctrine [5] and that it abused its discretion when it actively solicited the consent of third parties to the release of documents that it had held were irrelevant and not reasonably calculated to lead to admissible evidence.

## I. Facts

Immediately following the Governor's inauguration in January of 2003, Grove, an at will employee or official, was removed as Director of the Maryland Department of the Environment's Technical and Regulatory Administration. As mentioned above, Grove filed suit against the Governor in September of that same year alleging wrongful termination. At the time he filed suit, Grove also served the Governor with document requests. In addition to information relating to

---

asserting executive privilege or an assertion by the Governor of attorney-client privilege and/or the work product doctrine. Nor has our own research revealed such a case in this State. As we discuss below, *in camera* review and, necessarily, **expanded** *in camera* review may have additional constitutional implications when these assertions are made by the head of the Executive Branch of this State.

4. *Blades v. Woods*, 107 Md.App. 178, 667 A.2d 917 (1995).

5. As noted, *infra,* the trial court was complying with the directions of the Court of Special Appeals.

Grove's employment and termination, those requests sought access to personnel records of State employees who are not parties to Grove's suit and documents created and used by Governor Ehrlich's gubernatorial transition team. The record reflects that the total number of documents that might have initially been involved, was as high as 80,000 documents. The Governor declined to produce some of the documents sought on the grounds of executive privilege, attorney-client privilege, and/or the work product doctrine.

After several attempts by the parties to resolve the issue, Grove filed a motion to compel production of documents on August 12, 2004. On November 9, 2004, the Circuit Court for Baltimore City issued an order requiring, among other things, that the Governor produce a privilege log within 21 days or, alternatively, within 30 days make the documents that would be listed in such a privilege log available to Grove for inspection and copying. On November 24, 2004, the Governor filed a motion asking the Circuit Court to clarify or reconsider its November 9, 2004, order. Before the Circuit Court for Baltimore City ruled on the Governor's motion and based on the Circuit Court's November 9, 2004, order, the Governor noted his first interlocutory appeal to the Court of Special Appeals on December 10, 2004. On July 20, 2005, in an unreported opinion, the Court of Special Appeals dismissed that interlocutory appeal because the motion for clarification or reconsideration of the Circuit Court's November 9, 2004, order was still pending. The timing of the filing and the fact that the trial court had not ruled on the motion, according to the intermediate appellate court, had the effect of depriving it of jurisdiction over the matter.

On July 28, 2005, the Governor sent a letter to the Circuit Court for Baltimore City seeking clarification of and a hearing on that court's November 9, 2004, order. On February 2, 2006, the Circuit Court for Baltimore City denied the Governor's motion for clarification or reconsideration and reinstated its November 9, 2004, order. On February 10, 2006, the Governor noted its second interlocutory appeal to the Court of Special Appeals and sought to have all discovery stayed

pending the outcome of the appeal. On February 17, 2006, the Court of Special Appeals issued an order staying the Circuit Court's February 2 order. Later, on April 10, 2006, the Court of Special Appeals issued an order that read in relevant part:

"ORDERED that, while this appeal is pending, the Circuit Court for Baltimore City shall resolve appellants' pretrial discovery objections in conformity with the procedures set forth in this Order; and it is further

"ORDERED that appellants' counsel forthwith provide the circuit court with two copies of (1) every document sought by appellee's counsel that appellants contend is privileged and/or confidential, regardless of why appellants' counsel claims the document should not be produced in discovery, and (2) a concise written argument in support of whatever privilege and/or confidentiality requirement is alleged to be applicable; and it is further

"ORDERED that, after making an *in camera* inspection of the documents produced and the written arguments presented, the circuit court shall determine whether a particular document (1) should not be disclosed to appellee's counsel of record, or (2) should be disclosed to appellee's counsel of record, in their roles as officers of the court, at an expanded *in camera* hearing. . . ." [6]

On May 2, 2006, the Circuit Court convened an on-the-record conference with counsel for each party to determine the manner in which the trial court would comply with the Court of Special Appeals's order. At the hearing, the Governor asserted that 341 individuals fell within the category of individuals about which Grove was seeking information and offered to provide the trial court with 30 of those files for *in camera* review to demonstrate, by way of example, why the

---

6. This is a direct appeal from the circuit court's actions on remand, accordingly, we are not directly presented with the issue of the propriety of the Court of Special Appeals ordering the trial court to effectuate expanded *in camera* review. Our holding, however, on this issue resulting from the direct appeal is applicable to the issue.

information contained therein was confidential and/or privileged. On May 8, 2006, the Circuit Court issued an opinion and order which summarized the actions it was directing to be taken based on its review of the sample files. The opinion and order read in relevant part:

"Based on its in-camera inspection of the thirty (30) 'sample' personnel files, this Court believes that because these files represent individuals who were terminated during the relevant time period, all documents representing notice of *termination* by certified and regular mail, and all communications generated by each employee pertaining to said termination, *should* be *disclosed* to Appellee's counsel of record, in their roles as officers of the Court. This Court further believes that *all other* documents contained within these thirty (30) individual personnel files, when considered in light of Md. Rule 2–402 and the 'sparse' Maryland case law, *should* not be *disclosed* as *they are not relevant or likely to lead to admissible evidence. This Court finds that disclosure of these documents would unnecessarily reveal confidential information of each individual.*

". . . [T]his Court believes that the remainder of the three hundred forty one (341) individual files requested for production by Appellee Grove should be disclosed utilizing the same, precise methodology. . . .

"The Court assumes that counsel for Appellee Grove may wish to contact all of these three hundred and forty one (341) individuals. Counsel for both parties shall meet on or before May 31, 2006 and draft a joint letter which will thereafter be submitted to the Court for approval. Counsel for Appellee Grove may then utilize the approved letter in initially contacting the identified, terminated individuals to determine whether those individuals would object to further discussion o f their personal situations with counsel for Appellee Grove and/or whether they would be willing to waive any claims for confidentiality of their personnel file which would allow counsel further opportunity to review other aspects of the files not released herein. . . ." (Emphasis added.) (Footnotes omitted.)

On May 24, 2006, the Circuit Court for Baltimore City issued a second order and opinion. In it, the court discussed the parties' failure to agree on a letter to be sent to the 341 individuals in question. The court then directed the parties to mail a letter drafted by the court to those individuals. The Circuit Court also ordered the Governor to make certain State Agency documents and gubernatorial transition team documents available to Grove. On June 8, 2006, the Governor filed a motion for reconsideration or clarification of the May 24, 2006, order and asked the Circuit Court to amend its order to exclude expanded *in camera* review of attorney-client and work product materials. The Governor claimed that six of the requested documents related specifically to the Attorney General's efforts to defend the Governor in Grove's suit and another 29 documents related to other matters which were allegedly privileged. The Governor also produced a more detailed privilege log relating to these 35 documents and produced, for expanded *in camera* review, documents to which it had been previously claiming executive privilege.[7] Grove's June 16, 2006, opposition to the Governor's motion for reconsideration or clarification contained a waiver by Grove of his request to view certain documents in the Governor's possession specifically relating to the instant litigation. On June 23, 2006, the Circuit Court for Baltimore City, based on Grove's waiver, issued an order to the effect that four of the six documents relating to this litigation did not need to be disclosed. But, as to the other documents, the court denied the remainder of the Governor's motion for reconsideration or clarification effectively ordering the Governor to make them available for expanded *in camera* review.

On June 28, 2006, the Court of Special Appeals stayed the "communication and disclosure provisions" of the Circuit Court's May 24, 2006, order. Meanwhile the Circuit Court for Baltimore City continued to catalogue and file responses re-

---

**7.** Although claiming executive privilege, the Governor produced some of these documents while noting an objection. Others he produced after withdrawing a previously noted objection.

ceived from the 341 individuals who received letters from counsel at the direction of the Circuit Court. The last such entry in the record was dated August 28, 2006. On August 29, 2006, prior to the court of Special Appeals hearing arguments, this Court, on its own motion, issued a writ of certiorari to address the above stated issues. *Ehrlich v. Grove*, 394 Md. 307, 905 A.2d 842 (2006).

## II. Standard of Review

Maryland's discovery rules were deliberately designed to be broad and comprehensive in scope. *Baltimore Transit Co. v. Mezzanotti*, 227 Md. 8, 13, 174 A.2d 768, 771 (1961). The purpose of the rules is to expedite the disposition of cases, *Home Indem. Co. v. Basiliko*, 245 Md. 412, 415–16, 226 A.2d 258, 259 (1967), by eliminating, " 'as far as possible, the necessity of any party to litigation going to trial in a confused or muddled state of mind, concerning the facts that gave rise to litigation.' " *Kelch v. Mass Transit Admin.*, 287 Md. 223, 229, 411 A.2d 449, 453 (1980) (quoting *Klein v. Weiss*, 284 Md. 36, 55, 395 A.2d 126, 137 (1978)). They are not designed or intended to "stimulate the ingenuity of lawyers and judges to make the pursuit of discovery an obstacle race." *Barnes v. Lednum*, 197 Md. 398, 406–07, 79 A.2d 520, 524 (1951). Consistent with the principles just expressed, Maryland's discovery rules are to be liberally construed. *Kelch*, 287 Md. at 229, 411 A.2d at 453; *Klein*, 284 Md. at 55, 395 A.2d at 137. There are, however, limitations on the general proposition that discovery rules are to be liberally construed.

With respect to discovery matters, it is long settled that the "trial judges ' "are vested with a reasonable, sound discretion in applying them, which discretion will not be disturbed in the absence of a showing of its abuse." ' " *E.I. du Pont de Nemours & Co. v. Forma–Pack, Inc.*, 351 Md. 396, 405, 718 A.2d 1129, 1133–34 (1998) (quoting Kelch, 287 Md. at 229, 411 A.2d at 453 (quoting Mezzanotti, 227 Md. at 13–14, 174 A.2d at 771)). Thus, we will review the discovery dispute presently before us under an abuse of discretion standard. In *Dashiell v. Meeks*, this Court recently stated:

"We have [ ] said that judicial discretion 'is defined as the power of a court to determine a question upon fair judicial consideration with regard to what is right and equitable under the law and directed by reason and conscience to a just result.' *Schneider v. Hawkins,* 179 Md. 21, 25, 16 A.2d 861, 865 (1940) citing *Langnes v. Green,* 282 U.S. 531, 541, 51 S.Ct. 243, 247, 75 L.Ed. 520 (1931). . . . Generally, the standard is that absent a showing that a court acted in a harsh, unjust, capricious and arbitrary way, we will not find an abuse of discretion."

*Dashiell v. Meeks,* 396 Md. 149, 913 A.2d 10 (2006) (No. 27, September Term, 2006) (filed December 14, 2006).

### III. Discussion

#### A. Interlocutory Appeal

Prior to addressing the issues before us on appeal, we must first consider whether the Governor is entitled to appeal from the Circuit Court's discovery order.

█ Generally, the interlocutory nature of discovery orders requires that a potential appellant must await the final judgment terminating the case in the trial court before noting his appeal. *Montgomery County v. Stevens,* 337 Md. 471, 477, 654 A.2d 877, 880 (1995) (citing *Baltimore City Dep't of Social Services v. Stein,* 328 Md. 1, 7, 18, 612 A.2d 880, 883, 888 (1992); *Public Service Comm'n v. Patuxent Valley,* 300 Md. 200, 207, 477 A.2d 759, 763 (1984)). This general rule is found in the Maryland Code, where it is said that a party may only "appeal from a final judgment entered in a civil or criminal case by a circuit court." Md.Code (1973, 2006 Repl.Vol.), § 12–301 of the Courts and Judicial Proceedings Article. The limited statutory exceptions to this general rule are found in § 12–303 of the Courts and Judicial Proceedings Article, but nothing in that section specifically permits the Governor to note an interlocutory appeal in the present case.

" 'We have long recognized, however, a narrow class of orders, referred to as collateral orders, which are offshoots of the principle litigation in which they are issued and which are

immediately appealable as "final judgments" without regard to the posture of the case.'" *Stevens,* 337 Md. at 477, 654 A.2d at 880 (quoting *Harris v. David S. Harris, P.A.,* 310 Md. 310, 315, 529 A.2d 356, 358 (1987)). *See also Mandel v. O'Hara,* 320 Md. 103, 134, 576 A.2d 766, 781 (1990) (holding that Governor Mandel, who was asserting absolute immunity, was entitled to an interlocutory appeal under the collateral order doctrine because absolute immunity permits the defendant to avoid trial altogether and a review after trial would not protect that right for a defendant); *Patuxent Valley,* 300 Md. at 210, 477 A.2d at 764 (holding that "an order in an action for judicial review of an administrative decision, requiring administrative decision makers [who may be immune from suit] to stand for depositions, may be immediately appealed by the agency itself or, if a party, by the government of which the agency is a part.[ ]"). This narrow class of orders falls under the umbrella of the collateral order doctrine.

The collateral order doctrine "is based upon a judicially created fiction, under which certain interlocutory orders are considered to be final judgments, even though such orders clearly are *not* final judgments." *Dawkins v. Baltimore City Police Dept.,* 376 Md. 53, 64, 827 A.2d 115, 121 (2003). The creation of the collateral order doctrine was based on the "perceived necessity, in a very few ... extraordinary situations, for immediate appellate review." *Id.* at 64, 827 A.2d at 121 (citation omitted) (quotation omitted). An extraordinary situation may arise when a discovery order is directed at "high level government decision makers." *Stevens,* 337 Md. at 480, 654 A.2d at 881; *Patuxent Valley,* 300 Md. at 210, 477 A.2d at 764.

■ With respect to the operation of the collateral order doctrine, we have said:

" 'The "collateral order doctrine 'treats as final and appealable a limited class of orders which do not terminate the litigation in the trial court.'" *Bunting v. State,* 312 Md. 472, 476, 540 A.2d 805, 807 (1988), quoting *Public Service Comm'n v. Patuxent Valley,* 300 Md. 200, 206, 477 A.2d 759,

762 (1984). The doctrine is a very limited exception to the principle that only final judgments terminating the case in the trial court are appealable, and it has four requirements. As summarized by Judge Wilner for the Court in *Pittsburgh Corning v. James,* 353 Md. 657, 660–661, 728 A.2d 210, 211–212 (1999),

> "[w]e have made clear, time and again, as has the United States Supreme Court, that the collateral order doctrine is a very narrow exception to the general rule that appellate review ordinarily must await the entry of a final judgment disposing of all claims against all parties. It is applicable to a 'small class' of cases in which the interlocutory order sought to be reviewed (1) conclusively determines the disputed question, (2) resolves an important issue, (3) resolves an issue that is completely separate from the merits of the action, and (4) would be effectively unreviewable if the appeal had to await the entry of a final judgment. *See Peat, Marwick, Mitchell & Co. v. Los Angeles Rams Football Co.,* 284 Md. 86, 92, 394 A.2d 801, 804 (1978); *Clark v. Elza,* 286 Md. 208, 213, 406 A.2d 922, 925 (1979); *Shoemaker v. Smith,* 353 Md. 143, 725 A.2d 549 (1999)." ' "

*Dawkins,* 376 Md. at 58–59, 827 A.2d at 118 (quoting *In re Foley,* 373 Md. 627, 633–34, 820 A.2d 587, 591 (2003)). "The four elements of the test are conjunctive in nature and in order for a prejudgment order to be appealable and to fall within this exception to the ordinary operation of the final judgment requirement, each of the four elements must be met." *In Re Franklin P.,* 366 Md. 306, 327, 783 A.2d 673, 686 (2001). "[I]n Maryland, the four requirements of the collateral order doctrine are very strictly applied, and appeals under the doctrine may be entertained only in extraordinary circumstances." *In Re Foley,* 373 Md. 627, 634, 820 A.2d 587, 591 (2003) (citing *Pittsburgh Corning v. James,* 353 Md. 657, 660–661, 728 A.2d 210, 211–212 (1999); *Shoemaker v. Smith,* 353 Md. 143, 169, 725 A.2d 549, 563 (1999); *Bunting v. State,* 312 Md. 472, 476, 540 A.2d 805, 807 (1988)). Thus, the collateral order doctrine is a limited exception to the principle that only

final judgments are appealable and it may only be invoked in extraordinary circumstances when the conjunctive four-part test is met.

The Governor urges this Court to find that the collateral order doctrine does apply because the contested order "authorizes discovery into the decision-making processes of senior level government decision makers, and consequently poses a threat to the public's interest in efficient and unimpeded government deliberations." Moreover, the Governor asserts that if he were forced to delay his appeal until final judgment is entered, the excessive probing of the executive's decisional thought processes would already have taken place and could not be undone. The consequence of which would be to harm the public's interest in unimpeded deliberations by the executive branch.

Appellees argue that the collateral order doctrine does not apply in the present case because the disputes over discovery orders currently before the Circuit Court for Baltimore City-the existence of attorney-client privilege and the scope of expanded *in camera* review-do not conclusively resolve the remaining discovery disputes. There are no "important issues," to be decided on appeal because, according to Grove, the Governor has waived executive privilege and the issues addressed are not separate from the merits of the action because they are essential to the action. Moreover, even though documents have been made available to Grove through expanded *in camera* review, there is no risk of public harm because of a confidentiality agreement made between the parties. We disagree.

The Governor of the State of Maryland *has* asserted executive privilege with respect to certain documents sought by Grove in discovery and continues to do so in this Court. As such, separation of powers principles are implicated and we must address the application of Maryland's discovery rules when executive privilege is asserted as well as when a Governor asserts attorney-client privilege and/or the work product doctrine. Thus, this is a different context than that of *Zaal*[8]

---

8. *See* note 3, *supra* and part D, below.

and its progeny where **expanded** *in camera* review was applied without these additional factors. The additional factors of separation of powers, executive privilege, attorney-client privilege and the work product doctrine exist in the present case.

## B. Executive Privilege

With these principles in mind, we turn to the seminal case in Maryland addressing executive privilege and discovery, *Hamilton v. Verdow*, 287 Md. 544, 414 A.2d 914 (1980). In that case, the United States District Court for the District of Maryland certified questions of law to this Court.[9] One of the certified questions was "whether the doctrine of executive privilege prevents the discovery and the *in camera* inspection by the court of a confidential report prepared for and at the order of the Governor of Maryland." *Id.* at 546, 414 A.2d at 916. Judge Eldridge, writing for this Court, thoroughly expressed the legal and historical foundations of executive privilege:

"Our cases have recognized, however, that the Governor bears the same relation to this State as does the President to the United States, and that generally the Governor is entitled to the same privileges and exemptions in the discharge of his duties as is the President. *Magruder v. Swann*, 25 Md. 173, 212 (1866); *Miles v. Bradford*, 22 Md. 170, 184–185 (1864). In addition, we have observed, in various circumstances, that the principles behind the constitutional separation of powers, Art. 8 of the Maryland Declaration of Rights, place limits on a court's power to review or interfere with the conclusions, acts, or decisions of a coordinate branch of government made within its own sphere of authority. *See, e.g., Dep't of Nat. Res. v. Linchester Sand & Gravel Corp.*, 274 Md. 211, 218, 223–225, 334 A.2d 514 (1975); *Heaps v. Cobb*, 185 Md. 372, 45 A.2d 73 (1945);

---

**9.** *See* Maryland Code (1974, 2006 Repl.Vol.), § 12–603 of the Courts and Judicial Proceedings Article which provides a statutory framework for certified questions.

*Magruder v. Swann, supra; Miles v. Bradford, supra; Green v. Purnell,* 12 Md. 329 (1858); *Watkins v. Watkins,* 2 Md. 341 (1852).

"Moreover, it is apparent from the very nature of government that a legitimate necessity exists for the protection from a public disclosure of certain types of official information. Thus, at least as early as 1807, in the treason trial of Aaron Burr, Chief Justice Marshall, sitting on the circuit court, recognized the potential existence of an executive privilege from discovery for official governmental information and confidential communications to the executive. *United States v. Burr,* 25 Fed. Cas. 187, 191–192 (C.C.D.Va. 1807) (Fed.Cas. No. 14, 694). The Chief Justice acknowledged that, as a matter of public interest, President Jefferson might be able to prevent the disclosure by a potential prosecution witness of a letter to the President which allegedly contained state diplomatic secrets. Chief Justice Marshall observed (*id.* at 191–192):

"That the president of the United States may be subpoenaed, and examined as a witness, and required to produce any paper in his possession, is not controverted. I cannot, however, on this point, go the whole length for which counsel have contended. The president, although subject to the general rules which apply to others, *may have sufficient motives for declining to produce a particular paper, and those motives may be such as to restrain the court from enforcing its production.* I do not think precisely with the gentlemen on either side. I can readily conceive that the president might receive a letter which it would be improper to exhibit in public, because of the manifest inconvenience of its exposure. The occasion for demanding it ought, in such a case, to be very strong, and to be fully shown to the court before its production could be insisted on. I admit, that *in such a case, much reliance must be placed on the declaration of the president; and I do think that a privilege does exist to withhold private letters of certain description.* The reason is this: Letters to the president in his private charac-

ter, are often written to him in consequence of his public character, and may relate to public concerns. Such a letter, though it be a private one, seems to partake of the character of an official paper, and to be such as ought not on light ground to be forced into public view." (Emphasis supplied.)

*See also United States v. Burr,* 25 Fed. Cas. 30, 37–38 (C.C.D.Va.1807) (Fed. Cas. No. 14, 692 d).

"The necessity for some protection from disclosure clearly extends to confidential advisory and deliberative communications between officials and those who assist them in formulating and deciding upon future governmental action. A fundamental part of the decisional process is the analysis of different options and alternatives. Advisory communications, from a subordinate to a governmental officer, which examine and analyze these choices, are often essential to this process. The making of candid communications by the subordinate may well be hampered if their contents are expected to become public knowledge...."

*Hamilton,* 287 Md. at 556–58, 414 A.2d at 921–22 (footnotes omitted). Thus, the necessity and validity of executive privilege has been recognized for almost 200 years by the courts of this nation and although the recognition of the expansion of the concept to the decisional process of the executive's advisors acting in their advisory capacity has not been as long, it is equally necessary and valid. Both concepts are alive and well in Maryland.

With the exception of diplomatic or security matters, the privilege is not absolute, rather, it attempts to:

"[A]ccommodate the competing interests of a just resolution of legal disputes with the need to protect certain confidential government communications. Nevertheless, when a formal claim of executive privilege is made for confidential communications of the chief executive, or confidential communications of other government officials of an advisory or deliberative nature, there is a presumptive privilege, with the burden upon those seeking to compel disclosure. And

such communications 'are "presumptively privileged," *even from the limited intrusion represented by an in camera examination of the conversations by a court.*' [10]

"The treatment accorded a claim of executive privilege has varied somewhat depending on the circumstances. In many situations the courts have engaged in a balancing process, weighing the need for confidentiality against the litigant's need for disclosure and the impact of nondisclosure upon the fair administration of justice. This has been done where the privilege is asserted for potential evidence at a criminal trial, or where there is an allegation of government misconduct, or where the government itself is a party in the underlying litigation."

*Hamilton*, 287 Md. at 563–64, 414 A.2d at 924 (citations omitted) (footnotes omitted) (some emphasis added).

When, as is the situation in the present case, the government is a party to the litigation:

"[A] question of unfair litigation advantage may arise. In other words, the government may be in a position of asserting or defending a claim while at the same time depriving its opponent of information needed to overcome the government's position. In these circumstances, courts have weighed the government's need for confidentiality against its opponent's need for information. *See, e.g., [Stiftung v.] Zeiss, [ ]* 40 F.R.D. 318, 329, [(D.D.C.1966)] and cases there collected; *Olsen v. Camp*, 328 F.Supp. 728, 731 (E.D.Mich. 1969); *Kaiser Aluminum[ ] [v. U.S.] [ ]*, 141 Ct.Cl. 38, 157 F.Supp. 939, 945 [(Cl.Ct.1958)]. *Cf. Machin v. Zuckert*, 316

---

**10.** Judge Raker, discussing the origins and purpose of executive privilege, cited to the same *Hamilton* language in her dissent in *Office of Governor v. Washington Post Co.*, 360 Md. 520, 759 A.2d 249 (2000) (Raker, J. dissenting) when she stated: " '. . . [T]here is a presumptive privilege, with the burden upon those seeking to compel disclosure.' " 360 Md. at 594, 759 A.2d at 289 (quoting *Hamilton*, 287 Md. at 563, 414 A.2d at 925). "We went on to hold [in *Hamilton* ] that this presumptive privilege extended even to ' "the limited intrusion represented by an *in camera* examination of the conversations by a court." ' " 360 Md. at 594, 759 A.2d at 289 (quoting *Hamilton*, 287 Md. at 563, 414 A.2d at 925 (quoting *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 730 (D.C.Cir.1974))).

F.2d 336, 339 (D.C.Cir.1963), *cert. denied,* 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 124 (1963). Of course, in this situation, a determination by a court that the government's need for confidentiality is outweighed by its opponent's need for disclosure, does not absolutely prevent the government from maintaining confidentiality. *The government is then left with the choice of either producing the information or having the issue to which the information relates resolved against it. See, e.g., United States v. Reynolds, [ ] 345 U.S. [1,][ ] 5 [; 73 S.Ct. 528, 530–31 (1953)]; Smith v. Schlesinger, 513 F.2d 462, 468 (D.C.Cir.1975)....*"

*Hamilton,* 287 Md. at 564 n. 8, 414 A.2d at 925 n. 8 (emphasis added). In short, if the court deems that the government's opponent's need for the confidential information is greater than the government's need to protect the information, the government may still keep the information confidential at the risk of having those issues to which the matters relate decided against it.

The *Hamilton* Court further explained *in camera* review as it relates to situations in which executive privilege is invoked:

"It has repeatedly been stated that *in camera* inspection by the trial judge does not automatically follow whenever a claim of executive privilege is made.... *[T]he in camera inspection itself is an intrusion upon the privilege.* Thus, when a formal claim of executive privilege is made, with an affidavit stating that the demanded materials are of a type that fall within the scope of the privilege, they are presumptively privileged even from in camera inspection. The burden is on the party seeking production to make a preliminary showing that the communications or documents may not be privileged or, in those cases where a weighing approach is appropriate, that there is some necessity for production.... Consequently, absent such a preliminary showing by the party demanding disclosure, the claim of executive privilege should be honored without requiring an *in camera* inspection."

287 Md. at 566–67, 414 A.2d at 926–27 (citations omitted) (emphasis added).

It does not appear from the record, with respect to the documents the Governor claimed to be subject to executive privilege, that the Circuit Court for Baltimore City, in its November 9, 2004, opinion and order, or the Court o f Special Appeals, in its April 10, 2006, order, ever made an *explicit* determination under *Hamilton* that Grove had met his burden of making a preliminary showing that "the communications or documents *may not be privileged* or, in those cases where a weighing approach is appropriate, that there is *some necessity for production.*" 287 Md. at 566, 414 A.2d at 926 (emphasis added). Under Hamilton, if Grove did not meet this burden then "executive privilege should [have] be[en] honored without requiring an *in camera* inspection." 287 Md. at 567, 414 A.2d at 927.

It is conceivable that Grove met his burden under *Hamilton* for every document to which the Governor was asserting privilege and that the Court of Special Appeals's order was consistent with the next step therein, an *in camera* inspection. We simply do not know on this record, whether the trial court determined that Grove had met his burden under *Hamilton* as to every document that was ordered to be viewed *in camera*. Even if we did know, there is no way for this Court to now undo the possible infringement on executive privilege that may have occurred when an *in camera* inspection took place in a situation in which Grove may not have made the appropriate showing for each document the court viewed.

We went on to note in *Hamilton* that:

"[W]here a sufficient showing is made to overcome the presumption, the court should order an *in camera* inspection. Depending upon the issues and circumstances, the *in camera* inspection may be utilized to determine whether the material is privileged, to sever privileged from non-privileged material if severability is feasible, and to weigh the government's need for confidentiality against the litigant's need for production."

287 Md. at 567, 414 A.2d at 927. The above emphasized language encapsulates the basis for granting the present

interlocutory appeal. Simply put, the need to avoid a confrontation with constitutional implications between the Executive Branch and Judicial Branch over the production of material to which the Executive is claiming privilege may, in certain circumstances, necessitate that the Executive note an interlocutory appeal. If, as we are instructed it is above, an *in camera* inspection is an intrusion on executive privilege, attorney-client privilege and the work product doctrine, then, clearly, expanded *in camera* review is a more serious intrusion on those privileges because opposing counsel is being made privy to allegedly privileged information.[11] Thus, in situations such as the instant case in which executive privilege and the other privileges are asserted and the trial court orders an expanded *in camera* review of the materials to which privilege is asserted, on a case-by-case basis, the Executive may be able to note an interlocutory appeal so as to avoid a constitutional collision between the Executive Branch and the Judicial Branch.

■ Returning to the four-part test for the permissibility of interlocutory appeals laid out above and applying it to the instant appeal, the Governor easily meets the standard. First, the trial court's order conclusively determined that the Governor was ordered to disclose information which he was claiming

---

11. There is an intrusion on executive privilege, if it exists, even when there is a court order and/or a confidentiality agreement between the parties requiring opposing counsel, in this case Grove's attorney, to keep the information confidential even from his client. The requirement that an attorney keep from his client documents he has received in the process of representing his client, raises additional issues relating to an attorney's duty to zealously represent his client. The issue of the appropriateness of the imposition of limitations by trial courts on the relationship between attorneys and clients is being, with some frequency, discussed. *See* Monroe H. Freedman, *In Praise of Overzealous Representation—Lying to Judges, Deceiving Third Parties, and Other Ethical Conduct*, 34 Hofstra L.Rev. 771 (2006); Stephen Gillers, *Monroe Freedman's Solution to the Criminal Defense Lawyer's Trilemma is Wrong as a Matter of Policy and Constitutional Law*, 34 Hofstra L.Rev. 821 (2006); Jeffrie G. Murphy, *Well Excuse Me!—Remorse, Apology, and Criminal Sentencing*, 38 Ariz. St. L.J. 371 (2006); *see also* Symposium, *The Worcester County Bar Association Eighth Annual Autumn Afternoon of Continuing Legal Education Presenting "Sentencing in the State Courts "* (2006) (P.A. Wimbrow, III, Moderator).

was subject to privilege including executive privilege. Second, a potential intrusion on executive privilege and the other privileges, especially when asserted by a high governmental official, is an important issue. Third, the propriety of a potential intrusion on such privileges has nothing to do with the merits of Grove's wrongful termination claim. Fourth, disallowing the Governor's interlocutory appeal would be inappropriate under the circumstances because of the potential disruption to the deliberative process of the Executive Branch, a harm which, once executive privilege and the attorney-client privilege is broken, cannot be undone. Thus, the collateral order doctrine's four-part test is met and an interlocutory appeal is appropriate under these extraordinary circumstances involving discovery orders directed to a high government official.

### C. Expanded *In Camera* Review and Attorney–Client Privilege [12]

■ Maryland Rule 2–402(a) states in relevant part: "A party may obtain discovery regarding any matter, *not privileged....* " (Emphasis added). The type of privilege that is relevant in this portion of our discussion is that which exists between an attorney and his or her client.[13] Practically

---

**12.** This portion of our discussion treats the attorney-client privilege and the work product doctrine as being interchangeable for the purposes of clarity. With that said, we are, of course, aware of the differences between attorney-client privilege and the work product doctrine as laid out in *E.I. du Pont de Nemours & Co. v. Forma–Pack, Inc.,* 351 Md. 396, 718 A.2d 1129 (1998).

Although the Governor does not specifically assert the protection of the work product doctrine in his brief before this Court, he did assert it in pleadings related to the dispute giving rise to this most recent interlocutory appeal. In an effort to prevent confusion on remand, the Governor is free to re-assert the protection of the work product doctrine, as it relates to documents which are subject to the May 8 and May 24, 2006, orders, in order for the trial court to make a determination of its applicability consistent with this opinion and other relevant case law. *See, e.g., E.I. du Pont, supra.*

**13.** In *Newman v. State,* 384 Md. 285, 863 A.2d 321 (2004), Judge Battaglia thoroughly explained the purpose and scope of the attorney-client privilege:

"The Supreme Court has recognized the attorney client privilege as 'the oldest of the privileges for confidential communications known to the common law.' *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584, 591 (1981).

. . .

"We have stated that the privilege is an accommodation of the competing public interests of the need to promote candor in communications between attorneys and their clients and the general testimonial compulsion to divulge relevant evidence in the pursuit of truth and justice. *See Harrison [v. State],* 276 Md. [122,] [ ] 133, 345 A.2d [830,] [ ] 837 [(1975)]. It is so basic to the relationship of trust between an attorney and client that, although it is not given express constitutional protection, it is essential to a defendant's exercise of the constitutional guarantees of counsel and freedom from self-incrimination. *Id.*

"The privilege is understood to be 'a rule of evidence that prevents the disclosure of a confidential communication made by a client to his attorney for the purpose of obtaining legal advice.' *See E.I. du Pont de Nemours & Co. v. Forma–Pack, Inc.,* 351 Md. 396, 414, 718 A.2d 1129, 1138 (1998), citing *Levitsky v. Prince George's County,* 50 Md.App. 484, 491, 439 A.2d 600, 604 (1982). In *Harrison v. State, supra,* we adopted Professor Wigmore's definition of the attorney-client privilege:

["](1) Where legal advice of [any] kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his insistence permanently protected (7) from disclosure by himself or by his legal adviser, (8) except the protection [may] be waived.["]

276 Md. at 135, 345 A.2d at 838, quoting 8 JOHN H. WIGMORE ON EVIDENCE § 2292, at 554 (McNaughton rev. ed.1961) (footnote omitted). The common law privilege is codified in Section 9–108 of the Courts and Judicial Proceedings Article of the Maryland Code, which states, 'A person may not be compelled to testify in violation of the attorney-client privilege.' Md.Code (1974, 2002 Repl.Vol.), § 9–108 of the Courts and Judicial Proceedings Article.

"The privilege, although essential to an effective attorney-client relationship, is not absolute. *In re Criminal Investigation No. 1/242Q,* 326 Md. 1, 11, 602 A.2d 1220, 1225 (1992). We have observed that '[o]nly those attorney-client communications *pertaining to legal assistance* and *made with the intention of confidentiality* are within the ambit of the privilege.' *E.I. du Pont de Nemours,* 351 Md. at 416, 718 A.2d at 1138. This Court in *Lanasa v. State,* 109 Md. 602, 71 A. 1058 (1909), observed, '[T]o make the communications privileged, they . . . must relate to professional advice and to the subject-matter about which the advice is sought.' *Id.* at 617, 71 A. at 1064. *See also Morris v. State,* 4 Md.App. 252, 255, 242 A.2d 559, 561 (1968), quoting *Colton v. United States,* 306 F.2d 633, 637, *cert. denied* 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963) ('[T]he privilege extends essentially only to the substance of matters communicated to an attorney in professional confidence.')."

*Newman,* 384 Md. at 300–03, 863 A.2d at 330–31.

speaking, "[o]nce the attorney-client privilege is invoked, the trial court decides as a matter of law whether the requisite privilege relationship exists, and if it does, 'whether or not any such communication is privileged.'" *E.I. du Pont,* 351 Md. at 415, 718 A.2d at 1138 (quoting *Harrison v. State,* 276 Md. 122, 136, 345 A.2d 830, 838 (1975)). If that two-part test is met, then any communications which are subject to the privilege are not discoverable.

In the unusual circumstances of the present case, the Circuit Court for Baltimore City, in its May 24, 2006, order, acting pursuant to the Court of Special Appeals's April 10, 2006, order, effectively directed that certain documents which the Governor claimed were subject to attorney-client privilege be made available to Grove's counsel through expanded *in camera* review. After the Governor filed a motion for clarification or reconsideration, asserting the attorney-client privilege specifically to certain documents, and Grove filed a response, the Circuit Court, based on Grove's waiver of his request, found that four documents relating to Grove's litigation were privileged and denied the remainder of the Governor's motion. The consequence of which was to make some of the documents the Governor was claiming were privileged available to Grove's counsel for expanded *in camera* review.

The Governor argues that documents which are protected by the attorney-client privilege should not be subjected to expanded *in camera* review. He is correct. If they are protected by the privilege they are not subject to such expanded review. Grove counters by arguing that the Governor should not be allowed to assert the attorney-client privilege because, according to Grove, the Governor had never before asserted the attorney-client privilege with respect to the documents which are the subject of this appeal. Grove also argues that the Governor is asserting the privilege too broadly and that he has waived it by producing similar documents.[14]

---

14. We reject Grove's argument asserting that the Governor waived attorney-client privilege by producing documents similar to the ones for which he is asserting the privilege (without making a judgment as to

On or about April 5, 2004, in the Governor's amended response to Grove's request for documents, the Governor clearly made a blanket statement protecting documents subject to the attorney-client privilege. It is only natural, as the discovery process unfolds, that the scope of the Governor's blanket statements covering privileged material narrowed from many documents to fewer documents. Although it is preferred that responses to document requests be as accurate as possible and are complied with as soon as possible in the discovery process, it is unrealistic to require an entity as large

---

whether the Governor did produce documents similar to the ones he is claiming are privileged) as being not on point. Grove argues that attorney client privilege assertions must be consistent. According to Grove, "a privileged party cannot fairly be permitted to disclose as much as he pleases and then to withhold the remainder to the detriment of the [opposing party]." This language originated in *Greater Newburyport Clamshell Alliance v. Public Serv. Co. of New Hampshire*, 838 F.2d 13, 20 (1st Cir.1988), and came into Maryland when it was quoted in *Parler & Wobber v. Miles & Stockbridge, P.C.*, 359 Md. 671, 693, 756 A.2d 526, 538 (2000). Both the First Circuit and this Court, in the two cases, used "defendant" where Grove disingenuously inserted "[opposing party]" in his brief.

The cases were specifically directed at limitations on civil plaintiffs, not defendants, and correctly used the original language to refer to the express and implied waiver principle, which has its basis in fairness and consistency, that a *plaintiff* may not use the attorney-client privilege as both a sword (using such privileged information to assert his claim) and a shield (while at the same time denying discovery to a defendant as to the balance of the privileged information) against a *defendant*. The present case is readily distinguishable from *Greater Newburyport* and *Parler & Wobber* because the Governor is not a plaintiff and is not asserting a claim against Grove based upon the use of privileged information. The above principle of fairness and consistency does not, in this particular context, apply to this defendant. The principle of *Parler & Wobber*, to the extent previously applied in this State, relates to civil plaintiffs in professional malpractice cases. We said in *Parler & Wobber*:

"Maryland recognizes that the attorney-client privilege[s] ... are waived in any proceeding where the client challenges its hired professional's activity or advice.

"These waiver rules are based, in part, on the premise that the client cannot use the advice of a professional as sword to prove the client's case ... while at the same time asserting the privilege as a shield to prevent disclosing harmful information."

359 Md. at 692–93, 756 A.2d at 537–38 (citations omitted). *Parler & Wobber* simply has no applicability in the context of the present case.

as the Executive Branch to know and to name precisely what documents are protected by attorney-client privilege when they are collecting and sorting tens of thousands of documents in the early stages of a litigation with such broad discovery requests of this nature. The discovery process is designed, in part, to narrow the scope of information necessary to conduct a trial. In the early stages of that process lawyers may make blanket assertions to protect their clients and preserve the protection until the discovery process narrows the scope of inquiry to relevant documents. Once that point is reached, the protection is tailored to specific communications. The initial action of the Governor in broadly asserting the attorney client privilege was no different than the initial over-broad reach of Grove's discovery requests.

It is unclear from the court's June 23, 2006, order whether the Circuit Court actually determined that the documents were not subject to attorney-client privilege or whether, irrespective of the applicability of the privilege, the Circuit Court felt bound to subject them to expanded *in camera* review as a result of the Court of Special Appeals's April 10, 2006, order. In either eventuality, documents which are subject to the attorney-client privilege, generally, are not to be subjected to expanded *in camera* review because of the havoc such a practice would play with one of the cornerstones of our judicial system-the protected communication between an attorney and his or her client. Simply because the Governor is a government official does not make the protection of his communications with his attorney any less important or less viable. We conclude that the trial court acted improperly if it ordered that documents subject to attorney-client privilege be made available for expanded *in camera* review.[15] If it did so, it abused its discretion. Therefore, on remand any document determined by the trial court to fall within the coverage of

---

15. Documents covered by the attorney-client privilege may, and often do, individually relate to matters of trial strategy. Not only do such covered documents reflect their own content but a consideration of numbers of them may, in addition, disclose the actual, privileged, strategy of counsel.

attorney-client privilege or the work product doctrine shall not be made available to Grove or his attorney in any manner, including through expanded *in camera* review.

### D.   Third Party Letters

The trial judge granted Grove's request to view some of the information in the personnel files of 341 individuals and determined that the remaining information in those files was irrelevant.   Then, the trial judge caused a letter to be sent to the 341 individuals, whose information was in the files, asking them for permission to release the remaining information (the content of which the trial judge had already determined was irrelevant) to Grove's counsel.   This was improper.

The court below relied on the balancing test laid out by the Court of Special Appeals in *Blades v. Woods,* 107 Md.App. 178, 667 A.2d 917 (1995), to determine whether Grove's attorney should have access to information in the personnel files of 341 former State employees.   The *Blades* balancing test was originally expressed in *Zaal, supra,* a criminal case, but since *Zaal* it has been applied in factually or procedurally unique civil cases by this Court.   The relevant elements of the *Zaal* test have appeared in three civil appellate opinions of this State:   *Porter Hayden Co. v. Bullinger,* 350 Md. 452, 713 A.2d 962 (1998), *Baltimore City Dep't. of Social Services v. Stein,* 328 Md. 1, 612 A.2d 880 (1992), and of course *Blades* which relied on *Stein* and *Zaal* in formulating its test.   These cases are readily distinguishable from the present case because they do not directly involve the Governor of Maryland and his assertion of executive privilege, or the assertion by the Governor, or in fact an assertion by any party, of attorney-client privilege and/or the work product doctrine.

In *Porter Hayden Co.,* we addressed the propriety of a trial court's decision to rely on confidential settlement agreements reached in a prior federal court litigation, in which not all of the *Porter Hayden Co.* parties were involved, without disclosing those agreements to such parties in a subsequent litigation before a court of this State.   We held that the settlement

agreements were to be disclosed, in a manner consistent with the procedures laid out in *Zaal*, because it was inappropriate for the trial court to rely on the agreements as evidence and then to deny a party affected by its decision access to that evidence. *Porter Hayden Co.*, 350 Md. at 468–69, 713 A.2d at 970. At no point was any form of privilege, to include executive privilege, attorney-client privilege or the work product doctrine, raised. Therefore, *Porter Hayden Co.* is not applicable in the present case.

In *Stein*, the parents of Stephen Ray, in their own right and on his behalf, brought suit against James Stein for physical, mental, and emotional injury allegedly caused by lead paint poisoning suffered by Stephen while he was living in a home owned and managed by Stein. Stein, seeking information regarding Stephen's social environment that could offer alternative reasons for his alleged injuries, served the Baltimore City Department of Social Services (the "BCDSS"), *a nonparty*, with a notice to take a deposition *duces tecum* requiring the BCDSS's director to produce the agency's entire file on Stephen's family. The BCDSS, relying in part on Maryland Code (1957, 1991 Repl.Vol.) Article 88A, § 6, resisted the subpoena on the grounds that the records were (1) confidential and could only be released pursuant to a court order, (2) that the records were protected by executive or governmental immunity, (3) that executive or governmental privilege exempts the records from disclosure, and (4) that the social worker, and/or psychologist/psychiatrist-patient, privilege potentially applied to the requested portions of the record. *Stein*, 328 Md. at 4–5, 612 A.2d at 881–82. Stein filed a motion to compel and the trial court granted Stein's motion giving him access to any of BCDSS's files on Stephen's family. The BCDSS noted an appeal based on the collateral order doctrine. We resolved the matter on the basis of the confidentiality provision found in Art. 88A § 6 and did not reach the other claims of privilege.

The *Stein* Court found that the collateral order doctrine did not apply to the facts before it because the BCDSS was not a

party to the suit, 328 Md. at 12, 612 A.2d at 885, but allowed an appeal anyway holding that:

"[A] discovery order directed to a governmental agency, a non-party to the underlying action, requiring the disclosure of files which contain information which, by statute, is confidential except when disclosed by the agency or by court order, is immediately appealable by the agency. The harm which will occur to the agency and the public—the potential inability of the agency to acquire information essential to its mission—were we to hold otherwise is much greater than it would be for private individuals and entities."

*Id.* at 20–21, 612 A.2d at 889.

In so holding, the *Stein* Court found the circumstances presented to it were similar to the reasoning that the collateral order doctrine has permitted appeals in situations involving government official immunity. The *Stein* Court pointed out that if the BCDSS were forced to wait to appeal until after the records were disclosed the purpose of Art. 88A § 6's confidentiality protections would be frustrated just as the purpose of government official immunity would be frustrated if that official were not able to take an interlocutory appeal after a determination was made at the trial level regarding his or her immunity status. 328 Md. at 19, 612 A.2d at 889. In making this analogy, the *Stein* Court's purpose was to show the necessity of allowing the interlocutory appeal. Its purpose was not to imply that government official immunity applied to the facts before it.

Turning to the merits of the case, the Court noted that because of the nature of Stephen's family's (the plaintiffs in the underlying case) claim, the complete environment in which Stephen was raised had been put at issue by them and, therefore, should be available to the opposing parties. 328 Md. at 30, 612 A.2d at 894. Thus, the Court, relying on *Zaal*, determined that Stein, based on the reasonable possibility that reviewing the records would lead to discoverable evidence, was entitled to examine the records without having disclosed to him more of the documents than necessary, consistent with

the confidentiality protections in Art. 88A, § 6. *Stein,* 328 Md. at 30, 612 A.2d at 894. The *Stein* Court, however, did hold that the trial court erred in ordering BCDSS to release all of its records pertaining to Stephen's family and remanded the matter to the trial court to proceed consistent with the balancing test in *Zaal. Stein,* 328 Md. at 30, 612 A.2d at 895. The *Stein* case, albeit a civil case, was very similar to the *Zaal* case. It involved an underlying defendant attempting to counter the allegations proffered by a plaintiff.

In the *Stein* case, although the BCDSS asserted immunity and certain privileges, including executive privilege, the Court decided the confidentiality issues presented to it *solely* on the basis of the statutory requirements of Art. 88A, § 6 and never reached the applicability of immunity or *any type of privilege to include executive privilege, attorney-client privilege or the work product doctrine.* Thus, Stein is additionally distinguishable from the present case and does not apply here.

The *Blades* case, *supra,* involved the termination of a police officer who alleged he was terminated for racial reasons. It was determined in *Blades* that the police officer there involved did not have "absolute immunity." That court was also not dealing with any claims of executive privilege, attorney-client privilege, or the work product doctrine. The only issues discussed in that case concerned allegations that requests for interrogatories were over-broad in scope and whether confidential information was discoverable based on privacy concerns. Separation of powers issues and other privilege issues were not extant in that case.

While we do not expressly adopt, or overrule, the application of the *Zaal/Stein/Blades* balancing test in the context of a case involving executive privilege, attorney-client privilege and/or the work product doctrine, even if it were to apply—it was misapplied here.

■ In its May 8, 2006, order, the Circuit Court determined that certain records and communications pertaining to the termination of the 341 former State employees were relevant

to Grove's claim and should be subjected to expanded *in camera* review:

"Based on its in-camera inspection of the thirty (30) 'sample' personnel files, this Court believes that because these files represent individuals who were terminated during the relevant time period, all documents representing notice of termination by certified and regular mail, and all communications generated by each employee pertaining to said termination, *should be disclosed* to Appellee's counsel of record, in their roles as officers of the Court."

Then, in the same order, the trial court plainly stated that any additional information in those 341 individual's personnel files was irrelevant to Grove's claim:

"This Court further believes that all other documents contained within these thirty (30) individual personnel files, when considered in light of Md. Rule 2–402 and the 'sparse' Maryland case law [ ] *[See Blades v. Woods*, 107 Md.App. at 183, 667 A.2d at 919–20], *should not be disclosed* as *they are not relevant or likely to lead to admissible evidence. This Court finds that disclosure of these documents would unnecessarily reveal confidential information of each individual.*"

"... [T]his Court believes that the remainder of the three hundred forty one (341) individual files requested for production by Appellee Grove should be disclosed utilizing the same, precise methodology...." (Emphasis added.)

Despite this determination, the trial court then exceeded even the bounds of the Court of Special Appeals's finding in *Blades* by improperly assisting Grove in contacting the 341 individuals so that Grove might discuss their individual situations or obtain the release of information, including information the trial court had already determined was irrelevant or would lead to inadmissable evidence. The May 8, 2006, order continued, in relevant part:

"The Court assumes that counsel for Appellee Grove may wish to contact all of these three hundred and forty one (341) individuals. Counsel for both parties shall meet on or

before May 13, 2006 and draft a joint letter which will thereafter be submitted to the Court for approval. Counsel for Appellee Grove may then utilize the approved letter in initially contacting the identified, terminated individuals to determine whether those individuals would object to further discussion of their personal situations with counsel for Appellee Grove and/or whether they would be willing to waive any claims for confidentiality of their personnel file which would allow counsel further opportunity to review other aspects of the files not released herein...." (Footnote omitted.)

Apparently, the parties advised the trial court that they were unable to agree on the language of the letter to the 341 individuals. Consequently, *the court drafted a letter* to the 341 individuals and in its May 24, 2006, order, directed the parties to send it to the individuals in question. The letter read, in relevant part:

"We are writing to you to make you aware of a Court Order in the above-captioned litigation which may have implications for you. *Pursuant to an Order entered by the Court, which is enclosed, the State has been ordered to make available to Mr. Grove's counsel any notices of termination generated by the State of Maryland or one of its agencies, which were served by certified and regular mail and all communications generated by said employees (recipients of said notices) pertaining to said termination.* As is clear from the Court Order, these documents will not be released to anyone other than counsel in this matter and will continue to be held confidential unless you consent otherwise.

"Counsel for Mr. Grove has requested the right to contact you *and discuss further aspects* of this matter with you. You have the right to agree to discuss these matters with the attorneys or object and refuse to do so. You also have the right to determine whether you would object to the release of any information to anyone. In the event you have questions regarding the contents of this letter, you may

contact the undersigned at the telephone numbers listed below.

"Every effort has been made to protect all aspects of your confidentiality with regard to this matter. Additionally, it is hoped that this matter will be of no inconvenience to you. We request that you indicate below whether you consent or wish to withhold consent to being contacted by counsel. We respectfully request that you sign and return this letter in the enclosed self-addressed envelope which will go directly to the judge overseeing the litigation. A second copy of this letter is enclosed for your file." (Emphasis added.)

In short, the trial court ordered the parties to send a letter it drafted to the 341 individuals in order to obtain information, including the type of information it had already determined, in its May 8, 2006, order, was not relevant to Grove's claim. Pursuant to the May 8, 2006, order, Grove's attorney already had *access*, and for the procedure to gain access, to the information potentially relevant to Grove's claim—the documents and communications pertaining to the termination of those 341 former employees. This further action by the trial court far exceeded the actions prescribed even in *Blades*. The trial court made itself an active participant in aiding Grove.

We are troubled by the trial court's actions in two respects. First, the trial court's May 8, 2006, order is inconsistent. The trial court made a determination that only certain information in the personnel files of the 341 individuals was relevant to Grove's claim and subject to expanded *in camera* review. Then, in the same order the court determined that Grove should be allowed to contact the 341 former state employees in order to discuss their personal situations and their willingness to waive confidentiality with respect to their entire personnel files-including the very information that the trial court determined w as not relevant to Grove's claim. The end result is that the trial court encouraged Grove to contact the former employees about information it had *already determined was irrelevant to Grove's claim* and the order enabled Grove's attorney to go on a "fishing expedition" for additional claims against the Governor. Second, and perhaps most troubling,

the nature of the trial court's order and its authorship of the letter, put the trial court in a position where its orders proactively assisted Grove in building his case to the detriment of the opposing party, i.e. the Governor of Maryland.

We can perceive no proper reason why the trial court exceeded even the bounds of Blades in this manner.[16] Doing so was clearly an abuse of discretion. We recognize, however, that the letters to the 341 individuals cannot be "un-mailed" and that the attorneys for Grove, to the extent that they have had contact with any of the 341 individuals, cannot "uncontact" them. Regardless, the information so gathered, consistent with the trial court's original determination that the information was irrelevant, is not to be put before the finder of fact *in any case*. Moreover, any information received by the Circuit Court for Baltimore City in response to the letters mailed to the 341 former employees, is to be placed under seal and is not to be shared with Grove, his counsel, or any other entities.

## IV. Conclusion

For the foregoing reasons, we hold that an interlocutory appeal is appropriate under the extraordinary circumstance of a discovery order being directed to a high government official when the collateral order doctrine's four-part test is met. We also hold that the Circuit Court for Baltimore City abused its discretion when it ordered **expanded** *in camera* review of documents protected by the attorney-client privilege or the work product doctrine. The trial court also abused its discretion when it solicited the consent of third parties to the release of documents it held were irrelevant and not reasonably calculated to lead to admissible evidence in Grove's case.

---

**16.** We note again that we have neither previously adopted nor rejected the application of the *Zaal/Stein/Blades* test in this context—the Governor of Maryland asserting executive privilege or in the context of the Governor of Maryland, or any other person, asserting attorney-client privilege and/or the work product doctrine. We do not do so now. We merely point out that the trial court erred in applying that test, even if it were applicable.

ORDERS OF THE CIRCUIT COURT FOR BALTI-MORE CITY VACATED AND CASE REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT TO BE PAID BY THE APPEL-LEE.