991 A.2d 1234

**Joel FALIK, et al.**

v.

**James HORNAGE, et al.**

**Nos. 60, 90 Sept. Term, 2009.**

Court of Appeals of Maryland.

April 5, 2010.

Daniel L. Shea (Brault Graham, LLC, Rockville), on brief, for appellants in No. 60, Sept. Term, 2009.

John B. Bratt (Rodney M. Gaston, Miller & Zois, LLC, Glen Burnie), on brief, for appellees in No. 60, Sept. Term, 2009.

Daniel L. Shea (Brault Graham, LLC, Rockville), on brief, for appellants/cross-appellees in No. 90, Sept. Term, 2009.

Mitchell I. Batt (Thomas H. Talbott, Sullivan, Talbott & Batt, Rockville), on brief, for appellants/cross-appellees in No. 90, Sept. Term, 2009.

John B. Bratt (Miller & Zois, LLC, Glen Burnie), on brief, for appellees/cross-appellants in No. 90, Sept. Term, 2009.

Argued before BELL, C.J., HARRELL, BATTAGLIA, MURPHY, GREENE, ADKINS and BARBERA, JJ.

HARRELL, J.

The two cases in this consolidated appeal arise from unrelated automobile negligence actions presenting a common procedural background birthing significant discovery disputes. In each case, the respective defendants designated, in pre-trial discovery, Dr. Joel Falik, M.D. ("Dr. Falik" or "Appellant"), a neurosurgeon, as a non-treating medical expert witness. The plaintiffs in each case each noted two-fold depositions of Dr. Falik: a "records deposition duces tecum" to be followed at a later date by a testimonial deposition. The notices of records deposition duces tecum requested the physician to produce certain documents regarding his past services as a medical forensic expert witness. Dr. Falik filed motions for protective orders. The trial courts in each case issued orders directing Dr. Falik to produce at least some of the records sought. Dr. Falik sought immediate appellate review in both cases.

*Falik v. Hornage*

On 4 February 2008, James Hornage and Lora Ard Hornage (collectively, "Hornage") filed an amended complaint in the Circuit Court for Anne Arundel County alleging that they and their minor son were injured in an automobile accident

caused by Heather Britt's alleged negligence.[1] The defense designated Dr. Falik to conduct an independent medical examination of Ms. Hornage. Hornage thereafter issued a notice of a "records deposition duces tecum." The notice sought information regarding the physician's prior provision of forensic services. Dr. Falik filed a motion for a protective order in which he objected to several of the plaintiffs' requests. Specifically, he objected to the requests for the following documents:

- Copies of all of Dr. Falik's 1099s received from Law Firms and Insurance Companies for providing medical examinations and expert witness testimony on behalf of Plaintiffs and Defendants for the last five (5) years.

- An up-to-date list of all cases Dr. Falik has provided expert testimony for on behalf [sic] of either Plaintiffs or Defendants by way of trial, video, or deposition over the last five years. This list is to include the name of the Plaintiff, name of the Defendant, the Plaintiff's attorney's name and address, the defendant's attorney's name, address and phone number, the court location, case number, and the date of said testimony

- Dr. Falik's personal Federal and State Income Tax Returns for the past five (5) years.

- Dr. Falik's business Federal and State Income Tax Returns for the past five (5) years.

- A list of all cases wherein Dr. Falik was retained by the defendant's law firm within the last three years to perform medical examinations.

- A copy of Dr. Falik's calender that reflects appointments for defense related medical examinations, defense video tapped [sic] depositions, and occasions where the doctor testified live in any court for any defendant in a personal injury and workers compensation matter.

---

**1.** The first complaint was filed solely against Britt. The amended complaint included as a defendant USAA Casualty Insurance, the plaintiffs' insurance carrier.

The Circuit Court held a hearing on the motion, ultimately granting the motion in part and denying it in part. Memorializing its decision, the trial court issued the following order on 28 August 2008:

- Doctor Falik will provide Plaintiff's counsel all of his income tax records from the last three (3) years to include all 1099 forms and W–2 forms that are related to medical employment, and any other attachments, and all other income tax records which pertain to any medically related employment and ownership interest Doctor Falik has which receives monies from insurance companies or law firms for the purpose of conducting medical examination on injured persons who are pursuing claims for personal injuries.

- Doctor Falik will provide Plaintiff with a list of any and all depositions Doctor Falik has attended and any and all times he has testified at trial within the last three (3) years to include the name of the case, case number, name of the patient examined, name, address, and phone number of the attorneys involved, and the amount of compensation Doctor Falik was paid, and by whom.

- Doctor Falik will provide Plaintiff with any lecture materials or other materials he has provided to any group that he has lectured to within the last three (3) years that relate to the medical condition(s) in issue.

- Doctor Falik will provide Plaintiff with a list containing the total number of persons Doctor Falik has examined at the request of any defense attorneys or insurance company in any personal injury litigation case for the last two (2) years.

- Doctor Falik will provide Plaintiff with copies of any and all advertisement materials and promotional materials which reflect the services Doctor Falik has offered to any attorney or insurance company.

- Doctor Falik will provide Plaintiff with a list containing the total number of persons he has examined at the

request of any defense attorneys or insurance company in any personal injury litigation in the last two (2) years.

- Doctor Falik will provide Plaintiff with copies of any and all documents that reflect the amount of money that Doctor Falik has been paid for defense medical examinations in the years 2006, 2007, and 2008.

- Doctor Falik will provide Plaintiff with a list of all cases Doctor Falik was retained by any insurance carrier and by any of Defendant's attorneys and their respective law offices.

The order provided also that the "discovered material may only be used by counsel in this matter or in other legally related circumstances." In a footnote, the trial court noted that, although Dr. Falik did not supply the court with "specific details of the requested protective order for limitation on the discovered material, this Court is persuaded that the use of the discovered material should not be vulnerable to widespread public dissemination." On 29 September 2008, before the initial deposition could be taken, Dr. Falik filed a notice of appeal to the Court of Special Appeals.[2] In his brief filed 20 May 2009, Dr. Falik complained that the trial court erred as a matter of law and abused its discretion when it ordered him to produce the financial records it ordered. This Court, on its own motion, issued a writ of certiorari on 17 June 2009, prior to decision of the appeal by the intermediate appellate court. 409 Md. 46, 972 A.2d 861 (2009).

---

2. On 1 November 2008, Britt withdrew before trial Dr. Falik as an expert witness in the underlying Circuit Court case. It appears that Dr. Falik did not inform clearly the Court of Special Appeals that the defense withdrew him as an expert witness. He, however, did include in the Record Extract in the Court of Special Appeals the lines filed in the Circuit Court by Britt and United Services Automobile Association (Britt's insurance carrier) and the docket entries related to his withdrawal as a potential defense witness.

Hornage, in his brief, filed with this Court on 20 July 2009 (after the issuance of our writ of certiorari), informed us that the defense had withdrawn Dr. Falik as an expert witness.

*Falik v. Holthus*

On 18 January 2008, Clint and Julia R. Collins–Holthus (collectively, "Holthus") filed in the Circuit Court for Montgomery County a complaint against Gilberto Martinez alleging that they were injured in an automobile accident that occurred allegedly as a result of Martinez's negligence. Martinez designated Dr. Falik, the same expert that the defendant in *Hornage* designated, as a non-treating medical expert witness. Holthus filed a "notice of records deposition duces tecum," to be followed by a testimonial deposition, seeking information relating to Dr. Falik's prior services as a forensic expert witness. Dr. Falik filed a motion for protective order in which he objected to the following duces tecum requests:

10. Copies of all 1099 forms and/or those portions of the deponent's income tax returns for the last 2 years referencing any payments made to the depoponent(s) [sic] in connection with medical-legal services. (Other portions of the tax returns relating to professional expenses, other earned or unearned income and deductions are not requested)

\* \* \*

13. Any documents showing the amounts paid to Joel Falik, M.D. for independent medical examinations performed by Joel Falik, M.D. in 2006 and 2007.[3]

\* \* \*

17. All 1099s for the past two years for work done by deponent(s) at the request of or paid by [defense counsel's law firm] or any lawyer in that office including, but not limited to, [defense counsel].[4]

---

3. At the hearing before the trial court, Holthus's counsel indicated that this request contained a typographical error. He stated that the request should have asked for any documents showing the amounts paid to Dr. Falik for independent medical examinations in the years 2008 and 2007.

4. At the hearing before the trial court, counsel for Dr. Falik indicated that Holthus had withdrawn request # 17 and, as such, it was no longer

18. All 1099s for the past two years for work done by the deponent(s) at the request of or which was paid by any State Farm Insurance Company.

19. A list of all cases on which the deponent(s) has worked for the past two years for [defense counsel's law firm] or any lawyer in that office including, but not limited to, [defense counsel].

20. A list of all cases on which the deponent has worked for the past two (2) years for State Farm Insurance Company.

Holthus filed an opposition to the motion, but indicated that they would consent to a confidentiality order for the protection of Dr. Falik's privacy. The trial court held a hearing on 28 April 2009 and thereafter issued an order in which it granted in part and denied in part the physician's motion. The order directed Dr. Falik to produce the items listed in requests # 10 and # 18, but limited the requests to the years 2007 and 2008. The court denied the motion with respect to requests # 13 and # 17.[5] The order also contained the following limitations that addressed Dr. Falik's privacy concerns:

1. Dr. Falik may redact all identifying information from the documents produced, such as social security numbers and tax identification numbers.

2. Dr. Falik may mark/stamp all produced financial documents "CONFIDENTIAL."

3. For purposes of this case only, all confidential financial documents pertaining to Dr. Falik provided to Plaintiff's counsel may be reviewed only by counsel, counsel's staff, the parties, and any expert in this case.

4. Any and all confidential financial documents produced by Dr. Falik shall not be photocopied, scanned, repro-

---

in contention. The parties also indicated at the hearing that they had reached an agreement as to requests # 19 and # 20.

**5.** It is unclear from the record why the court denied the motion with respect to # 17 when counsel for Dr. Falik stated at the hearing that Holthus had withdrawn this request.

duced or disseminated in any way to anyone, other than counsel in this case, the parties or any expert, and may not be utilized outside of this case. These confidential financial documents and all copies thereof will be returned to Dr. Falik's counsel by Plaintiff's counsel within thirty (30) days of a final judgment or settlement of this case. Any expert or party who receives or views confidential financial documents regarding Dr. Falik shall agree in writing before receiving or reviewing same to abide by this Order and an executed copy of each such agreement shall be provided to counsel for Dr. Falik by counsel for Plaintiffs promptly upon the execution thereof.

5. Any confidential documents produced pertaining to Dr. Falik shall not be posted on the Internet, emailed, disseminated or communicated to any person or to any email list-serve or any similar such group or organization.

Dr. Falik and Martinez, apparently aggrieved by the trial court's only qualified favor found in the motion for protective order, filed timely separate notices of immediate appeal to the Court of Special Appeals. They complained in their briefs that the trial court erred as a matter of law and abused its discretion when it ordered Dr. Falik to produce the limited financial records it did. While that case was pending in the intermediate appellate court, but before arguments could be held, Dr. Falik filed in this Court a petition for a writ of certiorari,[6] pointing out the common issue assumedly presented in *Hornage,* for which we had issued already a writ of

---

**6.** Dr. Falik's successful petition contained the following question for our review:

Did the trial court err as a matter of law and abuse its discretion by ordering Joel Falik, M.D., a designated expert witness, to produce financial records for years 2007 and 2008, as follows:

Copies of all 1099 forms and/or those portions of the deponent's income tax returns for the last 2 years referencing any payments made to the deponent(s) in connection with medical-legal services. (Other portions of the tax returns relating to professional expenses, other earned or unearned income and deductions are not requested.)

certiorari. We granted the petition, 410 Md. 559, 979 A.2d 707 (2009), and consolidated *Holthus* with *Hornage.*

## Discussion

### I. *Martinez's Right to Appeal*

At the outset, we address Holthus's contention that Martinez, the defendant in *Holthus,* may not be an appellant in this matter. Holthus argues that the trial court's order was not a final judgment with regard to Martinez as a defendant and, because it does not fall within any exceptions to the final judgment rule, Martinez must wait for a final judgment before he may appeal the order. Generally, " 'a party may appeal only from a final judgment.' " *St. Joseph Med. Ctr., Inc. v. Cardiac Surgery Assocs.,* 392 Md. 75, 84, 896 A.2d 304, 309 (2006) (quoting *Nnoli v. Nnoli,* 389 Md. 315, 323, 884 A.2d 1215, 1219 (2005)). *See also* Md.Code, Cts. & Jud. Proc. § 12–301 (1974 & 2006 Repl.Vol.) ("[A] party may appeal from a final judgment entered in a civil or criminal case by the circuit court."). There are, however, three well-identified, but infrequently sanctioned, limited exceptions to the final judgment rule which permit appellate review before a final judgment has been rendered. *St. Joseph,* 392 Md. at 84, 896 A.2d at 309. The exceptions are: " 'appeals from interlocutory orders specifically allowed by statute; immediate appeals permitted under Maryland Rule 2–602;[7] and appeals from interlocutory

---

7. Maryland Rule 2–602 provides:
 (a) Generally. Except as provided in section (b) of this Rule, an order or other form of decision, however designated, that adjudicates fewer than all of the claims in an action (whether raised by original claim, counterclaim, cross-claim, or third-party claim), or that adjudicates less than an entire claim, or that adjudicates the rights and liabilities of fewer than all the parties to the action:
 (1) is not a final judgment;
 (2) does not terminate the action as to any of the claims or any of the parties; and
 (3) is subject to revision at any time before the entry of a judgment that adjudicates all of the claims by and against all of the parties.
 (b) When allowed. If the court expressly determines in a written order that there is no just reason for delay, it may direct in the order the entry of a final judgment:

orders allowed under the common law collateral order doctrine.' " 392 Md. at 84, 896 A.2d at 309 (quoting *Salvagno v. Frew,* 388 Md. 605, 615, 881 A.2d 660, 666 (2005)). Martinez does not contend that his appeal fits within any of the exceptions to the final judgment rule. Rather, he argues that Dr. Falik is the real party in interest in this case and, thus, the issue is not whether Martinez has the right to maintain his own appeal pursuant to the final judgment rule or its exceptions, but, whether Martinez has the right to join in the appeal maintained by Dr. Falik by virtue of Martinez's abundant interest in the outcome of the appeal.

In *St. Joseph,* a non-party to the underlying suit filed an interlocutory appeal from the trial court's refusal to grant a protective order from discovery in favor of the non-party. We held that the order was appealable, not under any of the exceptions to the final judgment rule, but because the order was a final judgment as to the non-party. 392 Md. at 88–89, 896 A.2d at 312. We reasoned that because the third person was not a party to the case, it would not have standing "to challenge the discovery order by appealing from a final judgment in that case." *Id.* at 88, 896 A.2d at 312. Thus, "analytically, it is a final judgment with respect to that appellant." *Id.* at 90, 896 A.2d at 313. Therefore, it is pellucid that, all other things being equal, Dr. Falik possessed a right to appeal from the orders entered in the present cases.

 That conclusion does not mean, however, that Martinez has a right to appeal the order under his theory that he may "tag along" in Dr. Falik's appeal. There is no statutory authority permitting an interlocutory appeal of a discovery order of this nature, nor is this appeal permitted under Rule 2–602. Thus, the only circumstance that would permit Martinez's appeal at this time is the collateral order doctrine. The collateral order doctrine

---

(1) as to one or more but fewer than all of the claims or parties; or (2) pursuant to Rule 2–501(f)(3), for some but less than all of the amount requested in a claim seeking money relief only.

treats as final and appealable interlocutory orders that (1) conclusively determine the disputed question; (2) resolve an important issue; (3) resolve an issue that is completely separate from the merits of the action; and (4) would be effectively unreviewable on appeal from a final judgment. The collateral order doctrine is a very narrow exception to the final judgment rule, and each of its four requirements is very strictly applied in Maryland. In particular, the fourth prong, unreviewability on appeal, is not satisfied except in extraordinary situations.

*St. Joseph,* 392 Md. at 86, 896 A.2d at 310 (quoting *Nnoli,* 389 Md. at 329, 884 A.2d at 1223) (internal citations and quotation marks omitted)). In the instant case, Martinez and Dr. Falik are challenging an interlocutory discovery order. It is well established in Maryland that generally "interlocutory discovery orders do not meet the requirements of the collateral order doctrine and are not appealable under that doctrine." *Id.* at 87, 896 A.2d at 311. Interlocutory discovery orders are not appealable because most

do not comply with the third requirement of the collateral order doctrine, as they generally are not completely separate from the merits of the lawsuit. Instead, a typical discovery order is aimed at ascertaining critical facts upon which the outcome of the ... controversy might depend. In addition, discovery orders fail to meet the collateral order doctrine's fourth element, as they are effectively reviewable on appeal from a final judgment.

*Id.* (citing *In re Foley,* 373 Md. 627, 635, 820 A.2d 587, 592 (2003) (internal citations and quotation marks omitted)). The "singular circumstance" in which an interlocutory discovery order is reviewable on appeal under the collateral order doctrine "involves trial court orders permitting the depositions of high level governmental decision makers for the purpose of 'extensively probing ... their individual decisional thought processes.'" *Id.* at 88, 896 A.2d at 311 (quoting *Montgomery County v. Stevens,* 337 Md. 471, 479, 654 A.2d 877, 881 (1995)).

The order in *Holthus* clearly does not fall within that category. Thus, we dismiss Martinez's appeal.[8]

## II. *Discovery of a Non–Treating Medical Expert's Financial Records*

Obviously, a party has a strong interest in the fact-finder's assessment of the credibility of its expert witnesses. For the opposing party it is equally important to have the ability to search for legitimate evidence to impeach the credibility of those witnesses. Bias is one method of impeachment and "[i]t is well established that the bias, hostility or motives of a witness are relevant and proper subjects for impeachment." *Pantazes v. State*, 376 Md. 661, 692, 831 A.2d 432, 450 (2003). *See also* Md. Rule 5–616(a)(4) ("The credibility of a witness may be attacked through questions asked of the witness, including questions that are directed at . . . [p]roving that the witness is biased, prejudiced, interested in the outcome of the proceeding, or has a motive to testify falsely."). "Bias describes 'the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party.'" *Pantazes*, 376 Md. at 692, 831 A.2d at 450 (quoting *United States v. Abel*, 469 U.S. 45, 52, 105 S.Ct. 465, 469, 83 L.Ed.2d 450, 457 (1984)). It is well established that the fact that an expert witness is being paid to testify may bear on his or her credibility and may be revealed through cross-examination. *Goldberg v. Boone*, 396 Md. 94, 116, 912 A.2d 698, 711–12 (2006); *Wrobleski v. de Lara*, 353 Md. 509, 518, 727 A.2d 930, 934 (1999); *Mezzanotte Constr. Co. v. Gibons*, 219 Md. 178, 181, 148 A.2d 399, 401–02 (1959). Thus, "an expert witness may be questioned on cross-examination about compensation received for testifying, as well as about the expert's history of employment as an expert witness, in order to reveal bias or interest in the outcome of the proceeding." *Goldberg*, 396 Md. at 116, 912 A.2d at 710–11.

---

8. Holthus argues also that Martinez failed to preserve for appellate review his objection to his trial court's order. Because we conclude that Martinez has no right to appeal, we shall not reach the issue.

■■■ "Expert opinion testimony can be powerful evidence." *Wrobleski,* 353 Md. at 517, 727 A.2d at 933. An expert's testimony "can have a compelling effect [on] a jury." *Id.* "That is why, especially with expert witnesses, 'wide latitude must be given a cross-examiner in exploring a witness's bias or motivation in testifying,' [and,] in particular, 'the cross-examiner must be given latitude to cross-examine a witness concerning any bias or interest the witness may have that would lead the witness to shade his testimony, whether, consciously or not, in favor of or against a party.' " *Id.* (quoting *Ware v. State,* 348 Md. 19, 67, 702 A.2d 699, 722 (1997)).

We described in *Wrobleski* the methods through which an erstwhile cross-examiner may expose the potential bias of an expert witness:

Exposure of potential bias based on self-interest is often attempted through cross-examination directed at how much the witness is being paid for his or her services in the case at bar, the frequency with which the witness testifies in similar kinds of cases, whether the witness is frequently employed by a particular type of party (usually plaintiff or defendant), whether the witness is frequently employed by a particular party or attorney and, if so, how much income the witness derives from that employment, and, as in this case, the amount or the percentage of the witness's total income that is derived from lawyer referrals or testimony in lawsuits. Some forms of inquiry seek to uncover a specific and enduring relationship between the witness and the party or attorney, from which a direct bias may be inferred. Others are directed at exposing the more subtle problem of the professional "hired gun," who earns a significant portion of his or her livelihood from testifying, and rather than having a tie to a specific party or attorney, may have a general economic interest in producing favorable results for the employer of the moment.

*Id.* at 517–18, 727 A.2d at 933–34.

We shall clarify and elaborate here our holding in *Wrobleski.* In *Wrobleski,* we considered the extent to which a

professional medical witness may be questioned regarding his or her professional services income stream. Defense counsel, at trial, asked the plaintiff's medical expert witness how much income he earned in one year from testifying as an expert. The witness refused to answer and the plaintiff objected in support of the witness. The plaintiff did not object to questioning the witness as to income earned from testifying in other cases brought by plaintiff's counsel, but asserted that any inquiry beyond that was irrelevant. The trial court allowed the defense question. *Id.* at 512, 727 A.2d at 931. We held that it was not error to do so and that it

> is generally appropriate for a party to inquire whether a witness offered as an expert in a particular field earns a significant portion or amount of income from applying that expertise in a forensic setting and is thus in the nature of a "professional witness." If there is a reasonable basis for a conclusion that the witness may be a "professional witness," the party may inquire both into the amount of income earned in the recent past from such services as an expert witness and into the approximate portion of the witness's total income derived from such services.

*Id.* at 526, 727 A.2d at 938. In other words, "[t]he relevant question is not simply whether the witness frequently appears in court but whether the witness has some personal or financial incentive to produce a particular opinion." *Id.* at 527 n. 5, 727 A.2d at 938 n. 5. We highlighted two caveats to our holding, however. We cautioned:

> First, we do not intend by our decision today to authorize the harassment of expert witnesses through a wholesale rummaging of their personal and financial records under the guise of seeking impeachment evidence. The allowance of the permitted inquiry, both at the discovery and trial stages, should be tightly controlled by the trial court and limited to its purpose, and not permitted to expand into an unnecessary exposure of matters and data that are personal to the witness and have no real relevance to the credibility of his or her testimony. Second, the fact that an expert devotes a significant amount of time to forensic activities or earns a

significant portion of income from these activities does not mean that the testimony given by the witness is not honest, accurate, and credible. It is simply a factor that is proper for the trier of fact to know about and consider.

*Id.* at 526, 727 A.2d at 938.

Dr. Falik argues here that the *Wrobleski* holding does not include within its scope the production of an expert witness's financial records. He agrees that the trial court has wide discretion in permitting cross-examination of an expert witness, but contends that the bounds of that discretion were exceeded in the present cases. He contends that *Wrobleski* held that before a party may inquire into the amount of income earned by an expert witness in the recent past from litigation services, the party first must establish that the witness is a "professional witness." Appellant argues further that, assuming that he is a professional witness (yet not conceding this fact), the trial court abused its discretion because it ordered Dr. Falik to produce financial records. That was error, as the argument continues, because *Wrobleski* limited the inquiry to verbal inquiry only into the amount of income the witness earned in the recent past from forensic services or the approximate portion of the witness's income derived from litigation services. Moreover, he worries that it may be burdensome for him to produce the information sought. Dr. Falik rejoins finally that sustaining the order of disclosure of the information sought in the present cases would precipitate a chilling effect and discourage other qualified physicians from serving as expert witnesses.

Holthus and Hornage argue that the documents ordered by the trial courts to be produced were within the scope of inquiries that this Court has held to be proper. Because *Wrobleski* held that a party may inquire into the amount of money that an expert witness earned from providing forensic services, Appellees believe that an opposing expert also may be compelled to produce documents directed at discovering that bias. In response to Dr. Falik's argument that the party seeking discovery must establish that the expert is a "professional witness" before it may inquire into his income from

litigation-related services, Holthus and Hornage contend that *Wrobleski* does not mandate such a requirement. They argue further that the trial court's orders do not authorize a whole-sale rummaging through Dr. Falik's financial records, which *Wrobleski* prohibited. In support of that contention, Appellees allude to the extensive confidentiality provisions in the order of the Circuit Court for Montgomery County and the limited scope of the information sought. Appellees urge that this is consistent with *Wrobleski's* requirement that the allowance of the permitted inquiry was controlled tightly by at least one of the trial courts involved here.

▮▮▮▮ In Maryland, the rules of discovery "were deliberately designed to be broad and comprehensive in scope." *Ehrlich v. Grove*, 396 Md. 550, 560, 914 A.2d 783, 790 (2007). Accordingly, that broad scope of discovery is described as allowing "[a] party [to] obtain discovery regarding any matter that is not privileged ... if the matter sought is relevant to the subject matter involved in the action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party." Md. Rule 2–402. Trial courts " 'are vested with a reasonable, sound discretion in applying [the discovery rules], which discretion will not be disturbed in the absence of a showing of its abuse.' " *Ehrlich*, 396 Md. at 560, 914 A.2d at 790 (quoting *E.I. du Pont de Nemours & Co. v. Forma–Pack, Inc.*, 351 Md. 396, 405, 718 A.2d 1129, 1133–34 (1998)). Therefore, we consider the trial courts' orders in the present cases under an abuse of discretion standard. *Id.* We explained the "analytical paradigm by which we assess whether a trial court's actions constitute an abuse of discretion ...," *Aventis Pasteur, Inc. v. Skevofilax*, 396 Md. 405, 418, 914 A.2d 113, 121 (2007), in *Wilson v. John Crane, Inc.*, 385 Md. 185, 198–99, 867 A.2d 1077, 1084 (2005):

"There is an abuse of discretion 'where no reasonable person would take the view adopted by the [trial] court[ ]' ... or when the court acts 'without reference to any guiding rules or principles.' An abuse of discretion may also be found where the ruling under consideration is 'clearly against the logic and effect of facts and inferences before

the court[ ]' ... or when the ruling is 'violative of fact and logic.'

"Questions within the discretion of the trial court are 'much better decided by the trial judges than by appellate courts, and the decisions of such judges should only be disturbed where it is apparent that some serious error or abuse of discretion or autocratic action has occurred.' In sum, to be reversed 'the decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.' "

*Id.* (quoting *In re Adoption/Guardianship No. 3598,* 347 Md. 295, 312–13, 701 A.2d 110, 118–19 (1997)).

Several courts have considered the issue of whether a trial court may compel an expert witness to produce potentially relevant income-stream financial records at the request of an opposing party. Although the courts and commentators may disagree on the outcome, many agree that the evidence may be relevant to the expert witness's bias. *See e.g., Sullivan v. Metro North R.R. Co.,* 2007 U.S. Dist. LEXIS 88938, at \*4 (D. Conn. 3 Dec. 2007) ("There is no question that the information sought by Sullivan is relevant to bias impeachment, and therefore, falls within the scope of permissible discovery. . . ."); *Behler v. Hanlon,* 199 F.R.D. 553, 561 (D.Md.2001) ("[N]o intellectually honest argument can be made that the information sought by plaintiff regarding [the expert's] activities as a defense expert witness is not relevant to bias/prejudice impeachment, and therefore within the scope of discovery. . . ."); *Cooper v. Schoffstall,* 588 Pa. 505, 905 A.2d 482, 494 (2006) ("[E]ven those jurisdictions that have substantially limited discovery of financial information from expert witnesses, generally recognize the relevance of the information. . . ."). *Contra* Douglas R. Richmond, *Expert Witness Conflicts and Compensation,* 67 Tenn. L.Rev. 909, 944 (2000) ("An expert's income, whether expressed as gross or limited to his litigation-related activities, is irrelevant the overwhelmingly majority of the time. A party is unlikely to be prejudiced

by its inability to obtain an expert's tax returns or similar income information.")

Some courts permit an opposing party's compelled production of an expert's financial records, but only after the party seeking discovery first attempts to use a less intrusive method of discovery or shows that the expert has been evasive, untruthful, or is unable to provide an answer to the income question. For example, in *Cooper*, the Supreme Court of Pennsylvania was faced with an issue similar to the one we confront today. The plaintiff, seeking tax and other financial records, presented excerpts from the records of prior cases in which the expert witness had conducted independent medical examinations on the request of the defense and/or testified on behalf of a defendant. These documents were offered to show that the physician "derived substantial income from this work, and issued written reports containing repetitive, predictable, defense-favored observations and conclusions." *Id.* at 485. The expert sought a protective order, which the court denied. The trial court entered an order directing confidential treatment of the information.

The Pennsylvania Supreme Court, citing our *Wrobleski*, held that a party could obtain "supplemental discovery related to potential favoritism of a non-party expert witness retained for trial preparation" if there are "reasonable grounds to believe that the witness may have entered the professional witness category. In other words, the proponent of the discovery should demonstrate a significant pattern of compensation that would support a reasonable inference that the witness might color, shade, or slant his testimony in light of the substantial financial incentives." 905 A.2d at 494–95. The court determined that the trial court did not abuse its discretion when it authorized discovery of the expert's financial records. *Id.* at 495. The court was sympathetic, however, to the expert's contention that it was burdensome to find and produce the financial information sought. Therefore, the court determined "that the appropriate entry point, upon the showing of cause, is a deposition by written interrogatories...." *Id.* Through this, the court opined, the proponent of

the discovery could inquire into, among other areas of possible bias, "the approximate amount of income each year, for up to the past three years, garnered from the performance of such services." *Id.* At that point, further discovery, such as obtaining financial records, might be warranted "if[,] [for example,] there is a strong showing that the witness has been evasive or untruthful in the written discovery." *Id.* at 496. *See also Behler,* 199 F.R.D. at 562 ("[T]here is no need for the expert to have to produce his or her tax returns, if the party seeking the discovery has accurate information regarding the percentage of income earned as an expert."); *Am. Family Mut. Ins. Co. v. Grant,* 222 Ariz. 507, 217 P.3d 1212, 1220 (App.2009) ("[I]f an expert is uncooperative or untruthful in responding to less demanding discovery requests, a trial court has discretion to permit more comprehensive discovery."); *Allen v. Superior Court of Contra Costa County,* 151 Cal.App.3d 447, 198 Cal. Rptr. 737, 741 (1984) (holding that the trial court abused its discretion when it failed to require a less intrusive method of discovery); *Elkins v. Syken,* 672 So.2d 517, 521–22 (Fla.1996) (adopting the intermediate appellate court's holding that "the production of business records, files, form 1099's may be only produced upon the most unusual or compelling circumstances...."); *Primm v. Isaac,* 127 S.W.3d 630, 639 (Ky.2004) (quoting *Elkins,* 672 So.2d at 521) ("If, after taking the deposition, a party can demonstrate that additional information is necessary to undertake reasonable bias impeachment, it may seek leave of court to take additional discovery. Further, should the trial court determine that the witness has not provided complete and unevasive answers to the deposition questions, or 'has falsified, misrepresented, or obfuscated the required data, the aggrieved party may move to exclude the witness from testifying or move to strike the witness's testimony...."); *State ex rel. Creighton v. Jackson,* 879 S.W.2d 639, 643–44 (Mo.Ct.App.1994) (holding that the trial court did not abuse its discretion in permitting the discovery of the expert's financial records where the party seeking discovery presented the trial court with evidence that in an unrelated deposition, the expert witness was unable to estimate his

annual earnings from litigation activities). *But see Ex Parte Morris*, 530 So.2d 785, 789 (Ala.1988) (holding that the prejudice to the non-party expert substantially outweighed the "incremental value that such information would provide respondent for purposes of showing bias. . . .").

Turning to the orders issued in the present cases, we conclude that the trial court in *Holthus* followed thoughtfully our guidance in *Wrobleski* to allow only a controlled inquiry into whether a witness offered as an expert earns a significant portion or amount of income from applying his or her expertise in a forensic nature and is thus in the nature of a "professional witness." Although the Circuit Court for Montgomery County ordered Dr. Falik to produce portions of his tax returns and related 1099 forms, it tailored the scope of the order to those portions which referenced any payment in connection with medical legal services and to a narrow sweep of contemporary time, the two years prior to the inquiry. Similarly, the ordered production of 1099 forms was limited in scope to the proffered expert's services as an expert witness or for work done at the request of the defendant's insurance carrier, State Farm Insurance Company. As noted above, the trial court's order also contained very specific confidentiality provisions to ensure that the information would not be disseminated to anyone beyond those individuals mentioned in the order. The document production ordered cannot be characterized fairly as a "wholesale rummaging" through Dr. Falik's personal finances and financial records.

With regard to *Hornage*, we note that the defendant withdrew Dr. Falik as an expert in the case after the trial court issued its discovery order, but before the physician complied with the ordered discovery, thus rendering the discovery dispute moot. "A question is moot if, at the time it is before the court, there is no longer an existing controversy between the parties, so that there is no longer any effective remedy which the court can provide." *Attorney Gen. v. Anne Arundel County School Bus Contractors Ass'n, Inc.*, 286 Md. 324, 327, 407 A.2d 749, 752 (1979). There is some concern that

the issue of this sort of discovery dispute may evade appellate review as a result of a party requesting overly broad financial information from an expert as a tactical approach to induce withdrawal of the expert from the case. We thus will comment on the order in *Hornage* for the limited purpose of comparing it with that in *Holthus* and illustrating what we otherwise would perceive to be an incorrect application of the trial court's responsibilities as set forth in *Wrobleski*. Unlike the order in *Holthus*, the trial court in *Hornage* did not control tightly the scope of the desired inquiry consistent with what was allowed by *Wrobleski*. The order directed Dr. Falik to produce all income tax records from the previous three years, without limiting the records to those related to forensic services. Such an order more closely approximates a "wholesale rummaging" through Dr. Falik's personal finances and is impermissible. Compliance with such an order would require an expert to turn over a multitude of sensitive financial records. Furthermore, if the expert was married, that could mean that records stating his or her spouse's joint income might be swept up in such broad discovery. It is true that such information could be redacted, as the trial court ordered in *Holthus*, but the trial court's order in *Hornage* did not so contemplate. The order contained insufficient confidentiality provisions. It stated only that the "discovered material may only be used by counsel in this matter or in other legally related circumstances" and that "the use of the discovered material should not be vulnerable to wide-spread public dissemination." The court did not define what a "legally related circumstance" might be nor did it define what constituted "widespread public dissemination." Unlike the order in *Holthus*, the order in *Hornage* did not prevent disclosure of the information and did not allow for redaction of sensitive or identifying information. Such considerations are especially in play where such a broad inquiry as sought in *Hornage*. We thus conclude that the trial court in *Hornage* abused its discretion by failing to control tightly the inquiry sought there.

Dr. Falik contends, as noted earlier, that the "inquire into" language in *Wrobleski* authorizes only verbal

inquiries and does not contemplate the compellable production of documents that support the verbal answers to the permitted verbal inquiries. He is wrong. The production of limited financial documents, from a contemporary and finite period of time, that reflect payments made to the witness in connection with medical-legal services is permitted because, if the inquiring party does not have access to such records, yet is permitted to inquire orally into the witness's income stream, the inquiring party will not be able to cross-examine effectively the expert witness. Civil trial practice in this area is not dependent on articles of faith; rather, corroboration is important. As the Missouri Court of Appeals noted, "a venal expert witness could not be expected to fully answer inquiries as to which the witness is not required to produce documentation." *State ex rel. Lichtor v. Clark*, 845 S.W.2d 55, 65 (Mo.Ct.App. 1992).[9] If an inquiring party's counsel is not allowed to view the records that purportedly support the expert's answers to the permitted questions, then it must accept the expert's answer without the opportunity to verify. We do not require blind trust without verification. A balancing of the expert witness's privacy interests against the inquiring party's ability to verify for effective cross-examination undergirds our decision. It is not meant to require the expert to produce every supporting paper. The trial court's order in *Holthus* is illustrative of the type of inquiry that is permitted.

 Appellant/Petitioner contends that *Wrobleski* established that the party seeking discovery must make a prima facie showing that the witness offered as an expert is a "professional witness" before it may demand the financial information allowed in *Wrobleski*. As noted *supra*, we stated in *Wrobleski* that "[i]f there is a reasonable basis for a conclusion that the witness may be a 'professional witness,' the party may inquire both into the amount of income earned in the recent past from services as an expert witness and into the approximate portion of the witness's total income derived from

---

9. There is no contention here that Dr. Falik was in any way suspected of being a "venal expert witness."

such services." 353 Md. at 526, 727 A.2d at 938. In hindsight, that sentence does seem a bit circular in its expectation. Being a professional witness ordinarily means being paid to give your opinion. If an individual is testifying as a non-treating medical expert, he or she, in the vast majority of cases, presumably is being paid to do so. More specifically to the instant cases, if a physician is paid to testify about someone who is not that physician's patient under treatment, that witness is surely a "professional witness." [10] Following Dr. Falik's theory, the party seeking discovery first must establish (by undefined criteria) that the witness is a "professional witness" before the party may be entitled to inquire into the witness's income stream. That is circuitous. If the answers that the party is seeking constitute the prima facie showing, it is unlikely that a party could ever establish that a witness is a "professional witness," without knowledge of the witness's prior income from expert services gained from sources other than through discovery in the immediate case. Thus, there is here no separate prima facie burden of proving that a proffered non-treating medical expert witness is a "professional witness."

We are not unsympathetic to Dr. Falik's concern that the discovery of the documents at issue in the present case may be seem to him to be an unwarranted invasion into his privacy. As previously noted, our decision here is the result of balancing a party's need to discover reliable and relevant information in order to try properly its case and the witness's expectation of privacy. We are confident, however, that leaving the implementation of our decision in the first instance

---

10. In a medical malpractice action, by statute, a health care provider who is offered as an expert witness, "may not devote annually more than 20 percent of the expert's professional activities to activities that directly involve testimony in personal injury claims." Md.Code, Cts. & Jud. Proc. § 3–2A–04(b)(4) (1974, 2006 Repl.Vol. & Supp. 2009). Thus, in a medical malpractice case, the amount of time that an expert spends testifying is indicative of whether he or she is a "professional witness." *Wrobleski* established that income earned from forensic testimonial activities also is an appropriate area of inquiry for experts in other types of actions.

**190**

with the sound discretion of the trial courts to control tightly the inquiry (with attendant confidentiality restrictions) will keep these sensitive records from being disseminated publicly. We note that attorneys, as officers of the court, have a duty to keep such records private, unless a court orders otherwise. *See* Maryland Rule of Professional Conduct 3.4(c) ("A lawyer shall not . . . knowingly disobey an obligation under the rules of the tribunal except for an open refusal based on an assertion that no valid obligation exists."). We acknowledge also Dr. Falik's argument that our holding in this regard might create a chilling effect on the willingness of qualified professionals to serve as expert witnesses in litigation-related contexts. Any concern we might share in that regard, however, is over-balanced by the need to create a context for effective cross-examination. Moreover, we are confident that a trial court's tight control over the process will restore to qualified professionals the confidence needed to encourage them to testify.[11,12]

---

**11.** We note that simply because the material is discoverable, that does not mean that the evidence will necessarily be admissible at trial. The evidence will be admissible only upon a showing by the proponent that it is relevant. Md. Rule 5–402. As the court noted in *Jackson*, "[t]he information will be admissible only if it legitimately reflects on the objectivity of the expert." 879 S.W.2d at 644 n. 1. Furthermore, it is within the court's discretion to exclude even relevant evidence if the court determines that "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Md. Rule 5–403.

**12.** In his brief, Holthus refers several times to various transcripts of depositions of Dr. Falik in separate, unrelated cases. Holthus apparently included these transcripts to show that Dr. Falik has "given conflicting answers in sworn testimony as to the amounts he earns serving as a professional witness." Holthus included the transcripts as an appendix to his brief.

Dr. Falik filed in this Court a motion to strike related portions of Holthus's brief and the Appendix that include and reference the transcripts on the ground that the deposition transcripts were not filed in the Circuit Court for Montgomery County, and, therefore, are not part of the record on appeal. Holthus concedes that the deposition transcripts are not part of the record that is before this Court. We grant Dr. Falik's motion to strike those portions of Appellees' brief and

ORDER OF 28 APRIL 2009 OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY IN NO. 90 AFFIRMED. APPEAL IN NO. 60 DISMISSED. COSTS TO BE PAID BY APPELLANT IN BOTH CASES, EXCEPT THAT IN NO. 90 APPELLEES TO BEAR PRINTING COSTS OF MATERIALS STRICKEN FROM THEIR BRIEF AND APPENDIX.

appendix to Appellees' brief and shall assign the related portion of the costs to Holthus. *See* Md. Rule 8–607(b) ("When unnecessary material has been included in a record extract or appendix, the Court may order that the costs of reproduction be withheld, apportioned, or assessed against the attorney or unrepresented party who caused the unnecessary material to be included.").